**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **MANDRELLA C. SHEPHERD-SALGADO** | ** | |
| | ** | |
| **Plaintiff,** | ** | |
| **vs.** | ** | |
| | ** | |
| **Tyndall Federal Credit Union, USAA FSB, Arizona Bank, AmeriCredit Financial Services, Inc., Santander Consumer USA, Inc., Chase Auto Finance Corp, , Capital One Auto Finance, Inc., Compass Bank,** | ** | **CIVIL ACTION NO.: 11-00427-B** |
| | ** | |
| **Defendants.** | ** | |

**FIRST AMENDED COMPLAINT**

1. Plaintiff, Mandrella C. Shepherd-Salgado, is an individual over the age of 19 years old and is a resident of Baldwin County, Alabama.

2. Tyndall Federal Credit Union is, on information and belief, a Federal Credit Union that does business in this district.

3. USAA FSB is a Texas Corporation that does business in this district.

4. Arizona Bank is, on information and belief, a National Bank that does business in this district

5. AmeriCredit Financial Services, Inc., is a Delaware Corporation that does business in this district.

6. Santander Consumer USA, Inc., is a Texas Corporation that does business in this district.

7. Chase Auto Finance Corp., is a Delaware corporation that does business in this district.

8. Capital One Auto Finance, Inc., is a Texas Corporation that does business in this district.

9. Compass Bank is an Alabama Corporation that does business in this district.

10. The events complained of herein occurred in the Southern District of Alabama.

11. This Court has jurisdiction over this matter based upon *28 U.S.C. 1331*, in that this dispute involves predominant issues of federal law. Defendants are liable unto Plaintiff pursuant to the provisions of the *"Fair Credit Reporting Act", 15 U.S.C. 1681, et seq.*, (FCRA) as well as other applicable federal laws.

**FACTUAL ALLEGATIONS**

12. During the month of April, 2011 Ms. Salgado was shopping for another automobile because the automobile she was driving had a bad transmission.

13. Plaintiff is a member of the Alabama National Guard, with the rank of Sargent, E-5, and works at Mercy Medical Center as a nursing assistant when not on duty with the National Guard.

14. As a part of her employment with the National Guard she often is required to drive potential new recruits to Montgomery Alabama for testing and evaluation. She is required to use her personal automobile for this purpose. Her employment, therefore, requires that she have a dependable automobile.

15. While car shopping, she visited a dealership, located in Baldwin County operated by Tameron Automotive Eastern Shore, LLC ("Tameron").

16. Upon arrival at the dealership she was greeted by one Geoffrey Orr, Tameron's agent and salesperson.

17. Before going to the dealership Ms. Salgado had approached the lien holder on her, then, current automobile, Lendmark, and arranged for preapproved financing of an automobile up to $10,000.00.

19. Mr. Orr showed Ms. Salgado several automobiles including one 2008 Mazda Model 5. The "total sales price" of the Mazda was represented to be $15,985.00 by Tameron on its internet advertisement. Ms. Salgado informed Mr. Orr that she was preapproved for only $10,000.00. Mr. Orr assured her that she had good credit and that they could finance the total sales price of the 2008 Mazda vehicle through lenders that Tameron did business with.

20. Instead of obtaining financing through a third party, Tameron extended credit directly to Plaintiff.

21. Ms. Salgado and Tameron entered into the retail installment and purchase agreement attached hereto as Exhibit "A." Exhibit "A" calls for Plaintiff to make 72 payments to Tameron Automotive Eastern Shore.

22. The underlying contract, Exhibit "A", stated that third parties were paid the following:

- to Government Certificate of Title Fees $16.50;
- to TAMERON for DOC FEE $499.99;
- to JM&A for GAP PROTECTION $795.00;
- to SERVICE CO for SERVICE CONT. $2,000.00; and
- Total other charges and amounts paid to others on your behalf $ 3,310.50

23. The statement "paid to others on your behalf $3,310.50" is deceptive, false and fraudulent. On information and belief all or most of the charges for "DOC FEE", "GAP" and "Service Cont" were retained by Tameron.

24. Tameron also required a down payment of $2,000.00 from Ms. Salgado and she tendered her personal check in that amount with the express understanding and agreement that the check would not be presented for payment until she received her income tax refund.

25. Her tax refund was due about two weeks from the date of the check and Tameron's agents assured her that the check would not be presented before she told them that she has received her tax refund.

26. Without the promises and assurances of Tameron and its agents she would never have entered into the purchase agreement.

27. Based on Mr. Orr's assurances and representations and those of other agents of Tameron the deal was consummated on April 9, 2011. On that date and occasion, Ms. Salgado traded in her vehicle, tendered a $2,000.00 check, obtained insurance on the vehicle being purchased and signed a retail installment contract, payable to Tameron.

28. Ms. Salgado was at the dealership for several hours and finally was able to leave late in the evening after being told that her loan was approved and that her lien holder was Wells Fargo Dealer Services, Inc.

29. The paperwork and documents that she was given also indicated that her lien holder would be Wells Fargo.

30. Instead of waiting, as agreed, for Plaintiff's tax refund to be directly deposited in her account, Tameron deposited the $2,000.00 check causing Plaintiff to incur bank charges.

31. Several weeks after the purchase of the vehicle, agents of Tameron called Ms. Salgado and informed her that there was a problem with her financing. The real problem was that Tameron was apparently having problems selling Ms. Salado's contract.

32. At the time she received the call she was on active duty and in the Tuscaloosa, Alabama area assisting tornado victims.

33. When she returned home from this duty and reviewed her mail she learned of the defendants' unauthorized access to her consumer credit reports.

34. Defendants were on notice that they were being asked to purchase an account rather than extend credit because of the date of the transaction. In other words consummation of the transaction was on April 9, 2011 and the impermissible inquires took place on May 2, April 21, and April 18, 2011.

35. At the time Ms. Salgado had signed the documents at the dealership, she was informed by agents of the dealership that her financing had been approved. Since she had credit approval and the transaction had been consummated, there was no reason for any further access to her consumer credit reports.

36. Apparently, however, Tameron, in an effort to sell her contract, submitted Ms. Salgado's credit application, without her authorization, to the defendants herein, each of whom pulled her credit report resulting in a lowering of her credit score. This is because of the excessive inquiries from defendants.

37. Tameron requested that Ms. Salgado return the vehicle to the dealership. Tameron claimed that it could not sell her contract to another lender because it could not verify her income.

38. In actuality, Tameron could not sell the contract because it was unwilling to offer the discount required by the banks and other financial institutions that purchase such paper from dealerships like Tameron. This in part because of the $3,000 plus cost of ancillary products that Tameron had added to the contract, padding the amount financed.

39. On the information and belief, another reason Tameron could not sell the contract is because there are Truth-in-Lending Act violations apparent on the face of it.

40. Because she needed the vehicle, Ms. Salgado instead of returning the car, as Tameron requested, provided Tameron with proof of insurance and tendered all the payments due under the contract to Tameron pursuant to the terms of her contract with Tameron. See Exhibit "A."

41. In breach of the parties' contract, Tameron refused Plaintiff's payments and instead sued her in state court for recovery of the vehicle.

42. The permissible uses of a consumer credit report are set out at 15 U.S.C. § 1681b(a)(3) which says that a consumer reporting agency may furnish a consumer report under the following circumstances and no other:

**(3)** To a person which it has reason to believe—

> **(A)** intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
> **(B)** intends to use the information for employment purposes; or
> **(C)** intends to use the information in connection with the underwriting of insurance involving the consumer; or
> **(D)** intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or
> **(E)** intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or
> **(F)** otherwise has a legitimate business need for the information—

>    **(i)** in connection with a business transaction that is initiated by the consumer; or
>    **(ii)** to review an account to determine whether the consumer continues to meet the terms of the account.

43.  When she returned home from Tuscaloosa she was surprised to find in her mail adverse action notices from the defendants herein stating that, based on her credit report, they had turned her request for credit down.

44.  She then ordered copies of her credit reports and learned of the unauthorized accesses.

45.  Arizona Bank processed an inquiry on Ms. Shepherd's credit report on April 21, 2011.

46.  Tyndall Federal Credit Union, on May 2, 2011, through its employees, impermissibly accessed Plaintiff's consumer report.

47.  USAA FSB, on April 21, 2011, through its employees, impermissibly accessed Plaintiff's consumer report.

48.  AmeriCredit, on April 18, 2011, through its employees, impermissibly accessed Plaintiff's consumer report.

49.  Santander Consumer USA, Inc., on April 18, 2011, through its employees, impermissibly accessed Plaintiff's consumer report.

50.  On April 18, 2011, Chase Auto Finance, through its employees, impermissibly accessed Plaintiff's consumer report.

51.  On April 18, 2011, Capital One Auto Finance, Inc., through its employees, impermissibly accessed Plaintiff's consumer report.

52. On April 21, 2011, Compass Bank, through its employees, impermissibly accessed Plaintiff's consumer report.

53. Defendants are "users" of credit information.

54. Defendants have been afforded, under contract, a direct access terminal whereby they may, for *permissible, lawful purposes*, access consumer reports from Equifax, Trans Union and possibly other consumer reporting agencies.

55. The purchasing of consumer paper from Tameron does not give rise to a permissible purpose for checking a consumer's credit because it is a commercial transaction between Tameron, the seller, and buyers, such as Defendants.

56. Defendants, upon each inquiry, certified to the consumer-reporting agency via automated code posting, that they had inquired "for extension of credit, review or other permissible purpose."

57. Defendants accessed plaintiff's consumer reports without any consent or knowledge of Plaintiff.

58. Defendants made the illegal and impermissible accesses, under false pretenses, by falsely certifying their alleged reasons for obtaining the consumer reports.

59. Plaintiff had no accounts, business dealings, or other transactions, of any kind, with defendants.

60. Defendants negligently and/or willfully violated the Fair Credit Reporting Act by impermissibly obtaining Plaintiff's consumer report.

61. Defendants obtained Plaintiff's consumer report under false pretenses and Defendants had no legitimate business need for that information.

62. Plaintiff has been damaged in that each of these unauthorized "pulls" of her consumer credit report has cause a drop in her credit scores.

**COUNT ONE**

63. Plaintiff realleges and adopts all of the relevant foregoing paragraphs contained in this complaint

64. Defendants are liable unto Plaintiff for the losses and damages caused by the Defendants' actions, as described herein, in the following illustrative, non-exclusive particulars:

a) Failing to comply with FCRA;

b) Invading Plaintiff's privacy by impermissibly accessing her consumer reports;

c) Defaming Plaintiff;

d) Obtaining Plaintiff's consumer reports under false pretenses;

e) Obtaining Plaintiff's consumer reports without any legitimate business need for those reports;

f) Failing to employ adequate and necessary procedures to avoid violations of FCRA;

g) Invading Plaintiff's privacy and endangering Plaintiffs' financial security;

h) Engaging in unfair and deceptive practices; and

i) Other acts of fault to be proven at a trial on the merits.

65. Plaintiff seeks damages, as follows:

a) Past, present and future lost out-of-pocket expenses;

b) Past, present and future mental anguish, embarrassment, frustration, humiliation and emotional distress;

c) Past, present and future loss of incidental time;

d) Past, present and future fear of personal safety and security;

e) Punitive damages, statutory damages, attorneys' fees, costs incurred and court costs; and

f) Any and all other damages which are reasonable in these premises.

**WHEREFORE, Plaintiff**, prays that after all due proceedings are had there be Judgment herein in favor of Plaintiff and against Defendants as follows:

That there be Judgment herein in favor of Plaintiffs and against Defendants, all reasonable damages sustained by Plaintiff, including, but not limited to, compensatory damages associated with the costs of out-of-pocket expenses, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal safety and security, and for punitive damages, attorneys' fees, costs incurred, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid. She further, prays for all such additional, general and equitable relief as may be necessary and proper in the premises.

## COUNT TWO
## COMPUTER FRAUD

66. Plaintiff realleges each and every relevant allegation of her original complaint as if fully set out herein.

67. This count is brought pursuant to 18 U.S.C. § 1030 et. seq.

68. On the dates and occasions complained of herein, the defendants, knowingly accessed a computer without authorization or exceeded their authorized access to such computer.

69. On information and belief, the records pertaining to plaintiff are stored on mainframe computers owned and/or operated by consumer reporting agencies.

70. By intentionally accessing said computers without authorization or by exceeding its authorized access, the defendant thereby obtained information contained in a file of a consumer reporting agency on a consumer, to wit, plaintiff, as such terms are defined in the Fair Credit Reporting Act 15 U.S.C. § 1681, et. seq., in violation of 18 U.S.C. §1030 et seq.

**WHEREFORE,** Plaintiff prays for actual damages, statutory damages, punitive damages, and attorney fees.

**RESPECTFULLY** submitted on this 25th day of August, 2011.

/s/ Earl P. Underwood, Jr.______
**EARL P. UNDERWOOD, JR.**
**Attorney for Plaintiff**

**OF COUNSEL:**
**UNDERWOOD & RIEMER, P.C.**
**21 South Section Street**
**Fairhope, AL 36532**
**(251) 990-5558 Voice**
**(251) 990-0626 Fax**
**epunderwood@alalaw.com**

**Plaintiff demands a trial by jury herein.**

/s/ Earl P. Underwood, Jr.____
**EARL P. UNDERWOOD, JR.**