# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MANDRELLA C. SHEPHERD-SALGADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 11-0427-WS-B |
| ) | |
| TYNDALL FEDERAL CREDIT ) | |
| UNION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## ORDER

This matter, which was recently transferred to the undersigned's docket, comes before the Court on a raft of very similar Rule 12(b) motions, to-wit: Defendants Santander Consumer USA, Inc. and AmeriCredit Financial Services Inc.'s Motion to Dismiss (doc. 40); Defendant JPMorgan Chase Bank N.A.'s Motion to Dismiss (doc. 42); Compass Bank's Motion to Dismiss (doc. 43); Defendant Capital One Auto Finance's Motion to Dismiss (doc. 45);[1] and Tyndall Federal Credit Union's Motion to Dismiss (doc. 49). All Motions have been briefed and are now ripe for disposition.[2]

**I.     Background.**

Plaintiff, Mandrella C. Shepherd-Salgado ("Salgado"), brought this action against more than a half dozen financial services firms, alleging violations of the Fair Credit Reporting Act, 15

---

[1] Capital One has requested oral argument on its Motion. Under the Local Rules, "the court may in its discretion rule on any motion without oral argument." LR 7.3. Upon review of the 15 extensive memoranda submitted by the parties as to these discrete legal issues, the undersigned concludes that oral argument would not be helpful in elucidating their positions. Accordingly, the request for oral argument is **denied**.

[2] The parties unnecessarily cluttered the case file by neither consolidating their briefing nor incorporating arguments from other briefs in any meaningful way. The inefficient result is that the litigants and the undersigned have been forced to slog through five sets of repetitive briefs, reviewing five iterations of virtually identical arguments, in search of any nuance that might materially alter the analysis from one Rule 12(b) Motion to the next.

U.S.C. §§ 1681 *et seq.* ("FCRA"), and the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.* ("CFAA"). She has resolved her claims against one defendant, leaving as remaining defendants Tyndall Federal Credit Union, Arizona Bank, AmeriCredit Financial Services, Inc., Santander Consumer USA, Inc., Chase Auto Finance Corp., Capital One Auto Finance, Inc., and Compass Bank. The Amended Complaint (doc. 22) alleges that in April 2011, these defendants impermissibly accessed Salgado's credit report via computer without her consent and under false pretenses, all in violation of the FCRA and the CFAA, thereby lowering her credit score.

More specifically, the Amended Complaint alleges that in April 2011, Salgado went shopping for a new vehicle at a local car dealership owned by nonparty Tameron Automotive Eastern Shore, LLC ("Tameron"). (Doc. 22, ¶¶ 12, 15.) Although Salgado had arranged for preapproved financing up to $10,000, the vehicle she selected for purchase was represented to have a "total sales price" of $15,985. (*Id.*, ¶¶ 17, 19.) In light of this gap, plaintiff understood that other financing arrangements would be necessary. "Instead of obtaining financing through a third party, Tameron extended credit directly to Plaintiff." (*Id.*, ¶ 20.) After several hours at the dealership, Salgado was informed (and given paperwork confirming) that her lien holder would be nonparty Walls Fargo Dealer Services, Inc. (*Id.*, ¶¶ 28-29.) After she drove off the lot in her new vehicle, "Tameron, in an effort to sell her contract, submitted Ms. Salgado's credit application, without her authorization, to the defendants herein, each of whom pulled her credit report resulting in a lowering of her credit score. This is because of the excessive inquiries from defendants." (*Id.*, ¶ 36.)[3] The Amended Complaint alleges, without elaboration, that defendants "were on notice that they were being asked to purchase an account rather than extend credit because of the date of the transaction," inasmuch as Salgado purchased her vehicle on April 9, 2011, but defendants' credit inquiries happened later in April and early May. (*Id.*, ¶ 34.)

---

[3] The Amended Complaint is rife with allegations concerning Salgado's dissatisfactions with Tameron, including her contentions that Tameron lied to her, breached its contract with her, violated the Truth-in-Lending Act, broke its promises to her, made false assurances to her, sabotaged its own efforts to "sell the contract" to the defendant lenders, and improperly padded the total sales price with bogus add-ons. However, none of those accusations are germane to this action. Tameron is <u>not</u> a defendant here and is not alleged to have an agency relationship with defendants. As such, plaintiff's insistence on besmirching Tameron in her pleadings and briefs is difficult to fathom. Tameron's dealings with Salgado are relevant only insofar as they provide background for, or otherwise relate to, defendants' acts of accessing her credit report.

Based on these allegations, the Amended Complaint alleges that defendants lacked a permissible, lawful purpose for accessing her credit reports, that they obtained those reports under false pretenses, and that such conduct violated the FCRA, as well as the computer fraud provisions of the CFAA. Defendants have now moved to dismiss these claims, reasoning that even under the well-pleaded allegations of the Amended Complaint, they had a proper purpose for accessing Salgado's consumer reports, such that they did not violate the FCRA. Defendants maintain that dismissal of the FCRA claim on these grounds would likewise require dismissal of the derivative CFAA cause of action. Plaintiff contends that both of these statutory claims are cognizable against each defendant.

**II.     Analysis.**

      *A.     Legal Standard for Motion to Dismiss.*

On a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the court construes the complaint in the light most favorable to the plaintiff and accepts all well-pled facts alleged … in the complaint as true." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009); *see also Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In ruling on a 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff."); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (similar).

To withstand Rule 12(b)(6) scrutiny, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation omitted). Thus, minimum pleading standards "require[] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly/Iqbal* principles require that a plaintiff plead "enough facts to state a claim to relief that is plausible on its face," whose allegations are "enough to raise a right to relief above the speculative level." *Speaker*, 623 F.3d at 1380 (citations omitted). The factual content of the complaint must "allow[] the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Id.* (citations omitted); *see also Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009) ("A plaintiff must provide enough factual allegations, which are assumed to be true, to raise a right to relief above the speculative level.").

### B. The FCRA Cause of Action.

As noted, the Amended Complaint includes allegations that defendants violated the FCRA both by obtaining Salgado's credit report without a proper purpose and by using false pretenses. These are not distinct violations of the FCRA, but are instead intertwined as a single claim for relief under the statutory scheme.[4]

"[T]he FCRA permits agencies to furnish credit reports only for certain statutorily enumerated purposes." *Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) (citation and internal quotation marks omitted). Under the terms of the statute, "[a] person shall

---

[4] In suggesting that the two theories are distinct, plaintiff invokes 15 U.S.C. § 1681q for her "false pretenses" liability argument. That section provides that "[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under Title 18, imprisoned for not more than 2 years, or both." *Id.* Before the current version of § 1681b went into effect in 1996, courts interpreted "false pretenses" as meaning "failure to disclose the lack of a permissible purpose." *Phillips v. Grendahl*, 312 F.3d 357, 364 (8th Cir. 2002) (citation omitted). With that 1996 amendment, however, "the civil liability provisions now explicitly cover the act of obtaining a consumer report without a permissible purpose, which formerly was included only by incorporating [§ 1681q]. Accordingly, … reliance in [a] complaint on section 1681q for civil liability is anachronistic and unnecessary." *Id.*; *see also Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp.2d 934, 937 (S.D. Ohio 2008) ("reliance on § 1681q, a criminal liability statute, is unnecessary, as the civil liability provisions now cover the act of obtaining a consumer report without a permissible purpose").

Alternatively, the "false pretenses" claim simply collapses into the "permissible purpose" claim for purposes of a FCRA analysis. *See, e.g., Simoneaux v. Brown*, 403 F. Supp.2d 526, 533 (M.D. La. 2005) ("A court determines whether a request for a consumer report has been made under false pretenses by looking at the permissible purposes for which consumer reports may be obtained under the Fair Credit Reporting Act."); *Scharpf v. AIG Marketing, Inc.*, 242 F. Supp.2d 455, 468 (W.D. Ky. 2003) ("It is well-established that if a person obtains and uses a consumer report pursuant to a valid permissible purpose authorized by … § 1681b, it cannot be liable under a false pretenses theory."); *Edge v. Professional Claims Bureau, Inc.*, 64 F. Supp.2d 115, 117 (E.D.N.Y. 1999) ("If no such 'permissible purpose' exists, the person requesting the information is deemed to have obtained the information under false pretenses."). Either way, there is no need to analyze Salgado's "permissible purpose" and "false pretenses" FCRA claims separately, as they are part and parcel of a singular alleged violation.

not use or obtain a consumer report for any purpose unless – (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified … by a prospective user of the report through a general or specific certification." 15 U.S.C. § 1681b(f). The FCRA's proscriptions in this regard "operate to support the confidentiality of consumer reports by limiting their dissemination." *Chester v. Purvis*, 260 F. Supp.2d 711, 717 (S.D. Ind. 2003); *see generally Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) ("Congress enacted FCRA in 1970 to … protect consumer privacy."); 15 U.S.C. § 1681(b) (purpose of FCRA is to require reasonable procedures "for meeting the needs of commerce for consumer credit … information in a manner which is fair and equitable to the consumer, with regard to the confidentiality … and proper utilization of such information").

The FCRA authorizes consumers to bring private suits for willful or negligent violations. *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1306 & n.2 (11th Cir. 2009); *Levine v. World Financial Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009) ("The Act provides civil liability for both willful violations … and negligent violations ….") (citations omitted). Thus, "where a user either willfully or negligently obtains a consumer's credit report without a permissible purpose, the user is civilly liable to the consumer." *Cappetta v. GC Services Ltd. Partnership*, 654 F. Supp.2d 453, 461 (E.D. Va. 2009); *see also Stergiopoulos v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1046 (7th Cir. 2005) ("If an entity requests a report for a purpose not listed in the Act, the injured consumer can recover the 'actual damages' caused by negligent noncompliance … or both actual and punitive damages caused by willful noncompliance ….").

To establish a FCRA claim of willful or negligent misuse or acquisition of a consumer report, a plaintiff must prove each of the following: (i) that there was a consumer report, (ii) that defendants used or obtained it, (iii) that they did so without a permissible statutory purpose, and (iv) that they acted with the specified culpable mental state. *See Phillips v. Grendahl*, 312 F.3d 357, 364 (8th Cir. 2002), *abrogated on other grounds by Burr*, 551 U.S. at 47; *Godby v. Wells Fargo Bank, N.A.*, 599 F. Supp.2d 934, 938 (S.D. Ohio 2008). The critical question presented by defendants' Rule 12(b) Motions is whether Salgado's well-pleaded factual allegations give rise to a plausible inference that defendants accessed her credit report without a permissible purpose. Under the FCRA, "any consumer reporting agency may furnish a consumer report … [t]o a

person which it has reason to believe … intends to use the information *in connection with a credit transaction involving* the consumer on whom the information is to be furnished and *involving the extension of credit to* … the consumer." 15 U.S.C. § 1681b(a)(3)(A) (emphasis added). To qualify under this subsection, "the 'credit transaction' must both (1) be a credit transaction involving the consumer on whom the information is to be furnished and (2) involve the extension of credit to, or review or collection of an account of, the consumer." *Pintos*, 605 F.3d at 674 (internal quotation marks omitted). The parties' briefs confirm that their dispute centers on whether this "permissible purpose" applies to defendants' conduct as alleged in the pleadings.[5] Accordingly, the Rule 12(b)(6) Motions turn on whether the Amended Complaint sufficiently alleges facts that defendants did not intend to use plaintiff's credit report in connection with a credit transaction involving the extension of credit to Salgado.

Plaintiff's filings show that her theory of FCRA liability against all defendants is that, when they accessed Salgado's credit report, there was no contemplated extension of credit because Tameron had already provided financing to Salgado. In that regard, the First Amended Complaint alleges that "Tameron extended credit directly to Plaintiff" and that "the deal was consummated on April 9, 2011," yet defendants pulled her credit report well after the fact on April 18, 2011 (defendants AmeriCredit, Santander, Chase, and Capital One), April 21, 2011 (defendants Arizona and Compass), and May 2, 2011 (defendant Tyndall Federal). (Doc. 22, ¶¶ 20, 27, 45-46, 48-52.) Plaintiff's argument is that, by the time defendants accessed her credit report, Salgado was not requesting that credit be extended, nor was she seeking to enter into a credit transaction with anyone; rather, she had already done so. In plaintiff's view, then, Tameron's efforts to sell or assign her contract to defendants did not constitute a "credit transaction involving" her, but were an entirely separate commercial transaction between

---

[5] At least one defendant invokes in passing the permissible purpose set forth in § 1681b(a)(3)(E). But no movant has reasonably developed this alternative ground for Rule 12(b)(6) relief, and this Court will not construct a party's arguments for it based on a cursory footnote in a brief. *See, e.g., Harris v. Hancock Bank*, 2011 WL 1435500, *2 n.4 (S.D. Ala. Apr. 14, 2011) ("Federal courts generally do not develop arguments that the parties could have presented but did not."); *Pears v. Mobile County*, 645 F. Supp.2d 1062, 1081 n.27 (S.D. Ala. 2009) ("The parties … cannot be heard to balk if the undersigned does not perform their research and develop their arguments for them."). For that reason, the analysis will focus on subparagraph (3)(A), not (3)(E).

Tameron and third parties. Salgado argues that those third parties' investigation into the desirability of that commercial transaction does not qualify as a permissible purpose under FCRA for them to access her credit report.

In response, defendants maintain that Salgado's theory of liability under the FCRA is foreclosed by the Seventh Circuit's ruling in *Stergiopoulos v. First Midwest Bancorp, Inc.*, 427 F.3d 1043 (7th Cir. 2005). At issue in that case was the legality of the "common scenario" in which automobile "[d]ealers routinely attempt to assign tentative financing arrangements to lenders, and those lenders often rely on a consumer's credit report to determine whether the deal is worth taking." *Id.* at 1044. Much like Salgado, the plaintiffs in *Stergiopoulos* argued that the permissible purpose delineated in § 1681b(a)(3)(A) was inapplicable because there was no credit transaction between the plaintiff and the putative lender, and that the transaction between the plaintiff and the car dealer was wholly separate from that between the dealer and the lender. The appellate court rejected this argument. Parsing the statutory language, the *Stergiopoulos* panel reasoned that "the provision merely requires that the entity must be engaged in a credit transaction in which the consumer is participating. … By requesting the plaintiffs' credit reports for the sole purpose of determining whether to furnish the plaintiffs with credit, [the lender] satisfied the FCRA's requirement[s]" that it must intend to use the information in connection with a credit transaction involving the extension of credit to the consumers. *Id.* at 1047. The court further explained that the lender had "pulled the plaintiffs' credit reports only because the plaintiffs sought financing for their new cars. The line of causation was direct and thus the request fell within the purview of subparagraph (3)(A)." *Id.*[6]

---

[6] Other authorities have reached similar conclusions using similar reasoning under similar facts and circumstances. *See Meeks v. Murphy Auto Group, Inc.*, 2010 WL 5174525, *8 (M.D. Fla. Dec. 15, 2010) (where car dealer told plaintiff she was approved for financing when she purchased new vehicle, and then later pulled her credit report, "such credit pulls were made for the legitimate purpose of putting Plaintiff into the vehicle she wished to purchase," and were for permissible purposes, despite plaintiff's argument that she had already been extended credit by dealer); *Wells v. Craig & Landreth Cars, Inc.*, 2010 WL 4810623, *2 (W.D. Ky. Nov. 19, 2010) (dismissing FCRA claim where plaintiff claimed that lender "conducted its inquiry into the credit history of Wells (a consumer) upon receipt of an application – allegedly on her behalf – from Craig & Landreth (a dealer in consumer goods), in connection with apparently securing financing for a vehicle," where facts raise no inference that lender should have doubted dealer's intentions in submitting application); *Enoch v. Dahle/Meyer Imports, L.L.C.*, 2007 WL 4106264, *3-4 (D. Utah Nov. 16, 2007) ("*Enoch I*") (where dealer led plaintiff to believe financing had
(Continued)

Based on *Stergiopoulos* and its progeny described in footnote 6, *supra*, defendants posit that their access of Salgado's credit report was permissible under subparagraph 3(A), even accepting as true every well-pleaded fact in the Amended Complaint. Indeed, defendants argue that plaintiff's own factual allegations establish "a credit transaction involving the consumer on whom the information is to be furnished" (namely, Salgado's credit application in connection with her purchase of a new vehicle) and that such credit transaction "involved the extension of credit … to the consumer" (inasmuch as all of the defendant lenders pulled Salgado's credit report only after Tameron sent them plaintiff's credit application for that vehicle purchase, such that those lenders intended to evaluate whether to extend credit to her).

These contentions resonate persuasively when the *Stergiopoulos* line of authorities is compared to the allegations in Salgado's Amended Complaint. In her pleading, Salgado admits that she completed a credit application in connection with her vehicle purchase in April 2011; thus, there was obviously a "credit transaction involving the consumer on whom the information is to be furnished." Likewise, Salgado acknowledges that Tameron "submitted Ms. Salgado's credit application, without her authorization, to the defendants herein." (Doc. 22, ¶ 36.) Thus, Tameron was effectively acting as Salgado's broker (albeit without her knowledge), attempting to obtain third-party financing to facilitate her desired vehicle purchase. Under any reasonable reading of these factual allegations, the defendant lenders were being asked to extend credit to Salgado for her new car, which is a permissible purpose for accessing her credit report under the FCRA.[7] Had they agreed to extend credit to her, these lenders would have stepped into the shoes

---

already been approved, and then shopped her credit application, lenders complied with § 1681b(a)(3)(A) where "they intended only to use [plaintiff's] credit information to determine whether to finance [her] vehicle purchase," and reviewed such information only after receiving credit application from car dealer); *Enoch v. Dahle/Meyer Imports, L.L.C.*, 2009 WL 499544, *4 (D. Utah Feb. 27, 2009) ("*Enoch II*") (declining to hold lenders responsible for car dealer's misrepresentations that plaintiff's financing had already been arranged, absent showing that lenders knew of such misrepresentations or obtained her credit report for impermissible reason); *Jones v. TT of Longwood, Inc.*, 2007 WL 2298020, *5 (M.D. Fla. Aug. 7, 2007) ("Obtaining a credit report in connection with a new business transaction in order to determine … whether the business wishes to undertake a transaction with the consumer, is a permissible purpose under the FCRA.").

[7] The well-pleaded allegations of the Amended Complaint do not suggest that defendants had any purpose for accessing Salgado's credit report other than to assess whether (Continued)

of Tameron, such that her loan payments would have been made directly to them and Tameron would have effectively been cut out of the relationship. *See Stergiopoulos*, 427 F.3d at 1047 (explaining consequences if auto dealer had been successful in selling plaintiffs' car loans to third-party lenders). On their face, these fact allegations – namely, that defendants accessed plaintiff's credit report when Tameron submitted her credit application to them pursuant to her vehicle purchase and accompanying request for financing – lie well within that "permissible purpose" delineated in subparagraph (3)(A), so as to defeat Salgado's FCRA cause of action.

In so concluding, the Court has carefully considered Salgado's objections and counterarguments set forth in her opposition briefs.[8] Plaintiff's principal contention is that the Amended Complaint states a plausible FCRA claim because its factual allegations show that, by the time defendants checked Salgado's report, "credit had already been extended and no further extension of credit was contemplated because the parties had consummated the transaction." (Doc. 53, at 6-7.) According to plaintiff, because she was not seeking an extension of credit at the moment when defendants accessed her credit report, that access could not possibly have been for the purpose of "a credit transaction … involving the extension of credit to … the consumer,"

---

they wanted to take the loan. Thus, it is clear from the pleadings that defendants obtained plaintiff's credit report in connection with her purchase of a vehicle and concomitant request for financing. There are certainly no facts in the Amended Complaint that might support an inference that defendants were violating the rule that "[a] third party cannot troll for reports, nor can it request a report on a whim." *Stergiopoulos*, 427 F.3d at 1047.

[8] Like her pleading, plaintiff's briefs devote considerable attention to Tameron's alleged wrongdoing, characterizing its actions as a nefarious "yo-yo" or "spot delivery" scam, and identifying purportedly deceptive or fraudulent charges that Tameron used to lard the contract value. But Tameron is not a party to this dispute (and the Amended Complaint identifies separate state-court litigation between Salgado and Tameron); moreover, Salgado identifies no colorable legal basis for tarring these defendants with Tameron's alleged misdeeds. At issue here is not whether Tameron treated Salgado fairly or lawfully, but whether defendants accessed her credit report for an improper purpose. Thus, the relevant facts are those concerning what defendants did and why they did it, not whether Tameron is a good or a bad actor. *See Enoch II*, 2009 WL 499544, at *4 ("That she allegedly was mislead as to the way the financing would be obtained is not relevant to the question of whether she participated in the transaction," absent any agency relationship between dealer and lenders). It is improper for plaintiff to taint these defendants via inflammatory allegations of a nonparty's transgressions, absent allegations of agency, complicity, or conspiracy, which have not been advanced.

as required to qualify as a permissible purpose under subparagraph (3)(A). However, plaintiff's attempt to split the auto dealer / consumer and auto dealer / lender interactions into two analytically distinct transactions for FCRA purposes has been rejected by persuasive authority cited by defendants. *See Stergiopoulos*, 427 F.3d at 1046-47 (construing subparagraph (3)(A) as implying a permissible purpose even if "the entity obtaining the credit report may not have a predicate credit transaction with the consumer directly," so long as "the entity must be engaged in a credit transaction in which the consumer is participating"); *Enoch I*, 2007 WL 4106264, at *3 (interpreting subparagraph (3)(A) as requiring only that the consumer be participating in a credit transaction in which the third-party lender was engaged).

        Confronted with these authorities, plaintiff does not argue that *Stergiopoulos* and *Enoch* misapplied FCRA or are otherwise wrongly decided. Instead, she attempts to distance herself from them factually. As to *Stergiopoulos*, plaintiff's position is that it is distinguishable because in that case, the lender made a credit inquiry on the same day that the plaintiffs signed their contracts with the car dealer, whereas here those inquiries took place at least a week later. But plaintiff does not explain, and the Court cannot discern, why that difference in timing should meaningfully impact the analysis. Certainly, nothing in the *Stergiopoulos* opinion suggests that the same-day temporal proximity between the plaintiff's execution of the contract and the dealer's submission of same to the lender was a significant, or even relevant, detail in the appellate court's analysis.[9] Moreover, plaintiff proffers no basis in logic or common sense for her proposed rule that a lender is engaged in a credit transaction in which a consumer is participating if both the consumer and the lender act on the same day, but not if there is a lag of a week or more between the consumer's execution of the contract and the lender's receipt of the credit application from the dealer. Conceptually, there remains a single, unitary credit transaction in which both lender and consumer are participating, even if the dealer / broker does not bring the lender into the picture until days or even weeks after the fact. Thus, plaintiff's proposed distinction is unpersuasive because there is no reason to think that the time difference

---

        [9]    In fact, the Seventh Circuit decision does not even mention, much less state its reliance on, the circumstance that the contracts were signed on the same day that the lender requested a credit report for the plaintiff. To unearth that fact, Salgado had to refer back to the unpublished district court opinion in *Stergiopoulos*. Surely, then, that factual detail is hardly a linchpin of the Seventh Circuit's holding.

would affect the analysis. Either way, defendants pulled Salgado's credit report only because she sought financing for her new car purchase.[10]

Nor can plaintiff successfully differentiate this case from *Enoch*. Salgado argues that her facts diverge from *Enoch* because she is claiming "that the transaction had already been consummated and credit had already been extended." (Doc. 53, at 8.) But there is actually no distinction at all in that regard. Enoch (just like Salgado) had argued "that the defendants lacked a permissible purpose in obtaining her credit because she had been told by [the dealer] that financing had been arranged for her before the Defendants obtained her credit report." *Enoch II*, 2009 WL 499544, at *4. Moreover, in *Enoch*, the plaintiff's allegations were that she had purchased a vehicle and driven it off the lot on May 10, 2004, with assurances from the dealer that financing had already been approved, but that the lenders accessed her credit report sometime after that, sending denial letters to the plaintiff weeks later. Factually, this is on all fours with Salgado's situation, so plaintiff's efforts to distinguish *Enoch* fail.

Salgado fares no better in offering up authorities of her own that might lend credence to her interpretation of subparagraph (A)(3). She cites and quotes extensively from *Young v. Harbor Mortor* [sic] *Works*, 2009 WL 187793 (N.D. Ind. Jan. 27, 2009), but that case is glaringly dissimilar. In *Young*, the district court rejected the defendant's subparagraph (3)(A) argument on a motion to dismiss, based on the critical fact that the plaintiff completed his credit application in such a manner that he "specifically limited who could check his credit to one entity," and that this limitation placed the defendant "on notice that it did not have permission to request Young's credit report." *Id.* at *4. Obviously, Salgado's pleading is devoid of allegations that she likewise limited or constrained which entities could check her credit report by notation

---

[10] Plaintiff also notes in passing that *Stergiopoulos* opined that "the car dealer served as a broker," 427 F.3d at 1047, and implies that no such broker analogy is appropriate here. The Court disagrees. The allegations in the Amended Complaint show that Tameron was no less of a broker than the dealership in *Stergiopoulos*. In both cases, the dealer was attempting to arrange financing for the purchaser of an automobile. In both cases, the dealer sought to remove itself from the credit transaction by attracting a third-party lender to take over the deal. In both cases, had the dealer been successful, the plaintiff would have been obliged to repay the loan to the third-party lender, not the dealer. There is no discernable distinction between the two cases on this point.

or directive on her credit application. *Young* does not help plaintiff; indeed, she admits that "[t]he allegations here are different than those in *Young*." (Doc. 53, at 9.)[11]

Likewise, plaintiff's reliance on *Levine v. World Financial Network Nat'l Bank*, 437 F.3d 1118 (11th Cir. 2006), misses the mark. Plaintiff indicates that *Levine* stands for the proposition that the FCRA provides no permissible purpose for a creditor to receive a consumer report as to a closed account. It does not. In actuality, the Eleventh Circuit noted "a difference in opinion" on this issue, and "reserve[d] judgment on whether there is an absolute prohibition against such requests by former creditors for accounts that are closed and paid in full." *Id.* at 1122. So *Levine* is not authority supporting plaintiff's position that credit reports can never be accessed where an account is closed or there is no credit to be extended. Even if it were, plaintiff's argument still

---

[11] Apparently, Salgado would analogize her case to *Young* on the ground that *Young* addresses a circumstance in which the lender was on notice (from the text of the credit application) that the consumer did not want that particular lender to access her credit report, while defendants here were likewise on notice that she did not want their credit. That contention fails. The facts of Salgado's Amended Complaint do not raise an inference that defendants were on notice that she did not seek an extension of credit from them to finance her vehicle purchase. To be sure, the Amended Complaint includes an allegation that "Defendants were on notice that they were being asked to purchase an account rather than extend credit because of the date of the transaction." (Doc. 22, ¶ 34.) This threadbare allegation is too conclusory to pass muster under *Twombly / Iqbal* scrutiny. The Amended Complaint does not allege that (i) defendants were aware that Tameron had previously informed Salgado that her loan had been approved and that the transaction had been financed; (ii) defendants were aware that Salgado's loan had been approved and that she no longer was seeking credit; or (iii) defendants knew Salgado had driven off the lot with her new vehicle on April 9, 2011, which was a week or more before they checked her credit. Moreover, plaintiff does not allege any facts or law suggesting that car purchasers are categorically forbidden from taking possession of a vehicle until they have received permanent financing, much less that defendants were aware of any such facts. Although the Amended Complaint alleges that she received "paperwork and documents" confirming that her lender was nonparty Wells Fargo (doc. 22, ¶ 29), there is no allegation that such paperwork and documents were submitted to defendants contemporaneously with her credit application. What we are left with, then, is a barebones conclusory allegation that defendants were "on notice" that Salgado did not need or want them to extend credit to her, without a single supporting fact. That is not good enough either to liken this case to *Young* or to withstand Rule 12(b)(6) scrutiny. Certainly, the "notice" allegations here are far cry from those in *Young*, where the plaintiff expressly limited his credit application to one entity.

founders on the dearth of facts suggesting that defendants were on notice or otherwise aware that Salgado had already received all the credit she wanted.[12]

For all of the gyrations and maneuvering by the parties in the 15 memoranda they collectively filed on the subject, the fundamental point here is quite simple. Salgado's Amended Complaint is devoid of facts suggesting that the credit application Tameron submitted to defendants was constrained in some way or that defendants had any reason to believe that Salgado (who had filled out the credit application to finance a car purchase) was not actually applying for credit at that time. Likewise, the Amended Complaint includes no facts raising an inference that defendants should have doubted Tameron's intentions when it submitted her application to them. To be sure, if the pleading's allegations are correct, then Tameron was trying to shop Salgado's contract for its own advantage. But if that pleading's factual allegations are correct, then defendants were deceived just as plaintiff was. According to Salgado, Tameron sent her credit application to defendants. The Amended Complaint alleges no facts or

---

[12] The larger point that bears emphasis is that § 1681b(a)(3)(A) turns on the user's intent, not on what the actual true facts may be. *See Trikas v. Universal Card Services Corp.*, 351 F. Supp.2d 37, 42-43 (E.D.N.Y. 2005) ("[p]laintiff's argument overlooks the plain language of the statute, which focuses on the *intent* of the party obtaining the consumer report," such that bank's inquiries into plaintiff's consumer report were lawful, even though made based on erroneous understanding of plaintiff's account status); *Scharpf*, 242 F Supp.2d at 459 ("consumer credit companies are permitted to furnish the reports where a third party … demonstrates an *intent* to use the report for the authorized purpose"); *Korotki v. Attorney Services Corp.*, 931 F. Supp. 1269, 1276 (D. Md. 1996) ("so long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA"). Thus, even if Salgado was not seeking an extension of credit, defendants would still have a permissible purpose to access her credit report if they intended to use that credit report in connection with a credit transaction involving the extension of credit to plaintiff. In other words, if defendants thought Salgado was asking for credit, they would have the requisite intent to access her report in connection with that transaction, even though defendants' understanding of her credit status and wishes was erroneous. The Amended Complaint alleges that Tameron submitted Salgado's credit application to defendants in connection with her vehicle purchase, which would logically give rise to an intent by defendants to obtain her credit report for a permissible purpose, unless those defendants also knew of facts negating the existence of that permissible purpose. Salgado's pleading identifies no facts that would have placed defendants on notice that no extension of credit was sought by Salgado in connection with the credit transaction at issue; to the contrary, defendants' receipt of plaintiff's credit application logically conveyed to defendants that she did seek an extension of credit, else why would Tameron have forwarded that document to them?

circumstances that would have alerted defendants that Salgado was not seeking an extension of credit for a new automobile purchase, that she had already obtained financing, and that Tameron was simply trying to "sell her contract." Nothing about the factual allegations of the Amended Complaint shows knowledge by these third-party lenders that all they were being asked to do was to "buy out" another lender. Thus, even taking all of the facts in the Amended Complaint as true, defendants pulled Salgado's credit report only because they intended to use it in connection with a credit transaction involving the extension of credit to Salgado. That is the very definition of a "permissible purpose" under subparagraph (3)(A).

Accordingly, the Court finds that the Amended Complaint does not state a claim for violation of FCRA upon which relief can be granted, and that defendants are entitled to dismissal of Count One on that basis.

### C. The CFAA Cause of Action.

As noted, Salgado has also brought a claim against defendants for violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.* This statute prohibits anyone from intentionally exceeding his or her authorized access of a computer and thereby obtaining information contained "in a file of a consumer reporting agency on a consumer, as such terms are defined in the [FCRA]." 18 U.S.C. § 1030(a)(2)(A). Although the CFAA is primarily a criminal statute, it also creates a civil cause of action in favor of "[a]ny person who suffers damage or loss by reason of a violation of this section … to obtain compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g).

Defendants maintain that this cause of action must also be dismissed because of the failure of the FCRA claim from which it flows. The plain language of the CFAA supports this result. After all, Salgado is endeavoring to predicate her CFAA cause of action on defendants' unauthorized access of her credit report. But if, as the Court has already found as a matter of law, defendants had a permissible purpose under the FCRA for accessing her credit report, such conduct was not unauthorized and cannot be a violation of the CFAA. *See, e.g., Edge v. Professional Claims Bureau, Inc.*, 64 F. Supp.2d 115, 119 (E.D.N.Y. 1999) ("Because Professional accessed Plaintiff's address for a permissible purpose under the FCRA, that access cannot be said to have been without 'authorization' as required to impose liability under the Computer Fraud Act."); *Ausherman v. Bank of America Corp.*, 352 F.3d 896, 900 & n.4 (4th Cir. 2003) (noting that CFAA claim fails where plaintiffs failed to produce evidence of FCRA

violation). Plaintiff does not object to this line of reasoning, but quite properly agrees that her claims "under 18 U.S.C. § 1030 should be dismissed if her claims under the FCRA are." (Doc. 53, at 12.) The existence of a permissible purpose under the FCRA to access a credit report nullifies any inference of culpable overreaching under the CFAA.

Inasmuch as all parties concur that Salgado's CFAA cause of action cannot stand if her FCRA claim fails, and inasmuch as the Court has already found that plaintiff has not stated an actionable claim under FCRA, defendants' Rule 12(b)(6) Motions are due to be **granted** as to the CFAA claim set forth in Count Two.

### III. Conclusion.

For all of the foregoing reasons, the undersigned agrees with defendants that the Amended Complaint fails to state a claim on which relief can be granted under either the FCRA or the CFAA.[13] Accordingly, defendants' Motions to Dismiss (docs. 40, 42, 43, 45, 49) are **granted**. The legal and pleading infirmities that preclude Salgado from pursuing her claims against the movant defendants are likewise fatal to her claims against defendant Arizona Bank, the only defendant that failed to file a Rule 12(b) Motion. Accordingly, the Amended Complaint is **dismissed without prejudice** in its entirety as to all claims and all defendants. A separate judgment will enter.

DONE and ORDERED this 7th day of November, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[13] Because plaintiff has already amended her pleading once upon being confronted with Rule 12(b)(6) motions, and inasmuch as she has not requested leave to do so a second time in response to defendants' current Motions to Dismiss, the appropriate remedy is dismissal of the Amended Complaint, rather than *sua sponte* inviting Salgado to file a third iteration of her complaint. *See, e.g., Wagner v. Daewoo Heavy Industries America Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) ("A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."); *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 (11th Cir. 2010) (reciting *Wagner* rule and stating that "Sanchez was represented by counsel but did not move for leave to amend, and we cannot conclude that the district court abused its discretion by failing to grant leave that was never requested").